## Case No. 12,629.

SEELEY et al. v. BEAN et al.

[3 App. Com'r Pat. 446.]

Circuit Court, District of Columbia. March 23, 1861.

### PATENTS—PUBLIC AND EXPERIMENTAL USE.

[The sale by an inventor of his perfected machines to persons, on trial, with the right to re-

turn them or keep them, as they saw fit, where made more than two years before the application for a patent, will bar the right thereto, as the use by such persons is a public and not an experimental use.]

Appeal from the decision of the commissioner of patents awarding to Bean and Wright priority of invention for improvements in machines for winnowing grain, and awarding to them the right to receive a patent therefor, supposed to be in substance the same invention for which a patent was granted to Griswold and Seeley November 22, 1859.

MORSELL, Circuit Judge. The commissioner adopts the report of the examiner, dated December 12, 1860, for his opinion, which, in substance, states that "the invention involved in the interference in this case has relation to a peculiar mode of vibrating a sliding screen, as well as to a novel arrangement of devices combined to control the movement of the several members of the machinery. Ellis Michael has withdrawn the interfering clauses of his claim, and of course from this interference. The question of priority of invention is therefore limited to the application of Bean and Wright, and the patent of Griswold and Seeley. Between these the interference is manifest, and the interference was properly declared between their several claims to the combination of a sliding screen, a rock shaft, and a vibrating bar, arranged in the manner and for the purpose set forth. From the testimony it appears, with some degree of certainty, but not absolutely so, that Bean used the combination in question in fan mills which were sold in the latter part of the year 1857. It is positively certain from the testimony of the leading witness that the invention in question was sold into public use by Bean and his then partner in the spring of 1858, but the first mills having the improvement upon them were sold as experimental machines. The purchasers had the right to keep them as they saw fit. The patentees, Griswold and Seeley, produce no evidence of an earlier invention by them of the improvement in question than the spring of 1859, but they argue that the sale by Bean & Burrows of the mills having the improvement attached to them, in the fall of 1847, constituted an abandonment of the invention to the public. The applicants were clearly, from the testimony before the office, the prior inventors, as between the parties to this interference. I am not aware that either the patent law or the decisions of our courts have fixed any precise period applicable to the experimental use of new inventions. The period for experiment must depend upon the nature of the invention and the opportunities of the inventors, so that what would not constitute proper diligence under some circumstances, where the experiments went over a few months, would not amount to abandonment under others, though the experiments might have gone over 15 or 20 years. In the present case, one or

even two harvest seasons would have been no unreasonable period for experiment; and, even if the proofs were clear that the invention had been used by Bean & Burrows in the harvest season of 1857, it would be an extremely stringent enforcement of the rule of diligence to require them to apply for a patent within two years from that date, or to refuse them a patent on the ground of abandonment. I cannot think the law so rigid, and none of the decisions relied upon go to the extent. The experiment was proper, and, with no violence to the true rule of construction, could have been permitted to go through the harvest of 1858 without an extraordinary indulgence to those applicants, without granting too long a time to determine to the public. But, on the idea of the first experiment having been put before the public in the spring of 1858, as the positive recollections of the witness Burrows show it to have been, the applicants are clearly within a time that wholly excludes a constructive abandonment of their invention, for they made this pending application for a patent for the improvement in question in February, 1860, and are thus wholly saved by the act of 1839, § 7 [5 Stat. 354]. For these reasons, etc., this report is adopted and confirmed by the commissioner, December 12, 1860, and priority of invention awarded to Bean and Wright, to whom a patent was accordingly directed to issue."

To this decision the appellant filed eight reasons of appeal. They appear to be sufficiently full and sufficiently specific to cover all the points that will be considered in the decision of this appeal. As they are extended to considerable length, they will only be referred to as forming a part of this proceeding. The report of the commissioner in reply to the reasons of appeal is substantially the same with the decision just recited, except that the point as to what may properly be regarded as an experimental use of an invention, in connection with the rule of diligence required of an inventor to secure the legal protection of his exclusive right, and to avoid the presumption of abandonment, is more elaborately presented. The commissioner says: "It is possible, from the evidence in the interference, that the invention was attached to fan mills sold in the latter part of the year 1857." There is positive evidence that the invention was put on sale in the spring of 1858 by one of the joint inventors, but (the commissioner says) the sales were qualified sales. The purchasers "had the right to keep them or return them as they saw fit." And it is alleged that the sales of the invention embodied in these fan mills sold at both periods were for the purpose of an experimental test of the character of the improvement claimed, and certainly the fact of the very terms of the sale at the latter period sustains the allegation of the experimental condition of the use of the invention. If it had not been for an experiment, the opposite party was bound to show that the sales had

been open and without conditions; for, by the terms of the sales that were then made, the purchaser s privilege postponed the closing of the contract of sale until his experiments should determine, in his estimation, the value of the improvement, and this determination on his part was the best evidence that the inventor could have that his invention was valuable. In other words, the terms of the sale left the machines the property of the vendor, held at his risk, and without liability for deterioration from accident or wear by the purchaser, who only became liable for the price or acquired any property in the machines when determined to keep them. Until he thus determined, he was but the agent of the owner, and the presumption is both fair and legal that a part of the consideration in the sale on such favorable terms was that the experiment should be made by the purchaser fairly and fully; that is to say, in a proper manner, and through a sufficient period of time to determine whether the improvements were valuable. He says, "As stated in the decision, the time for, or period of, experiment must be governed by the character of the invention and the condition of the inventor." To illustrate his position, he puts the case of plaster designed to protect the outside of buildings against the action of light, heat, and moisture, and also a composition to protect timber from decay, etc.; showing that the length of time might be shorter or longer according to the nature of the subject. The conclusion which he comes to is thus expressed: "The time, then, within which the office regarded an experimental use of an improvement in winnowing machines legitimate was not unreasonably stated in the decision. Even more than two harvesting seasons might not be too long for experiments," etc. He says: "In the present case, to take the most unfavorable view of the acts of the applicant, and admit that the machine was conditionally sold having this improvement upon it in the fall of 1857, and that it was then experimentally used, could it be viewed as right and lawful to fix abandonment upon the inventor? The decision was against so rigid a rule of construction, and I am still of opinion that the experimental use of the improvement was not unreasonable." That an experimental is not a public use, in the meaning of the patent law, although an experiment may be publicly used, etc.

Such appeared to be the state of the proceedings when laid before me by the commissioner, according to previous notice given of the time and place of trial, together with all the evidence, original papers, etc. The principal point discussed by the commissioner in his opinion and report relates to the effect of the delay on the part of the appellee in making his application for a patent. He supposes the sale. made as stated in the evidence, was a conditional sale for the purpose of experiment,—the exercise of a right allowed to him by the principles of patent law. The nature and extent of this right depend on circumstances. It must be used consistently with the policy, spirit, and nature of the statute law on the subject requiring vigilance and newness at the time of application. Those applicable to the present questions are the acts of 1836, §§ 6, 15 [5 Stat. 119, 123], and 1839, § 7 [supra]. The statute of 1836, among other things, creates a bar in express language, stating what shall be a good defense, and, after enumerating several others, says: "Or had been in public use, or on sale, with the consent and allowance of the patentee before his application for a patent, or that he had surreptitiously or unjustly obtained the patent for that which was in fact invented or discovered by another who was using reasonable diligence in adapting and perfecting the same." The same, in substance, is to be found in the first section of this statute, relative to applicants for patents, as a prerequisite. Act 1839, § 7, modifies this defense, the latter part of which is in these terms: "And no patent shall be held to be invalid by reason of such purchase, sale or use prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public or that such purchase, sale, or prior use, had been for more than two years prior to such application for a patent."

That the transaction with respect to the sale may be understood, I will proceed to state the substance of the testimony of the witnesses. Elisha Davis says that he worked in the shop of Bean & Burrows in the summer of 1857 and in the year 1858. He gives a full and minute description of the mill in question, with the attachment of the particular invention. These mills, he says, were first built by Bean & Burrows in the summer or fall of 1857. In the closing part of his testimony he says: "In the latter part of the year 1857, mills were built in Bean & Burrows' shop, in Hudson, containing the vibrating bar, rock shaft, and cleaner. but I do not know who put them in. I understood they were built for public use." Wm. Thayer says he worked for Bean & Burrows in 1857 (it does not appear that he worked for them in any other year) making fanning mills. He thinks he commenced about the month of July. That during the time he worked for them he knew of mills being made in their shop with the vibrating bar, rock shaft, and cleaner combined. He thinks these mills were made and sold for public use. On cross-examination he says that Bean & Burrows sent off mills with the vibrating bar, rock shaft, and cleaner, but he does not know whether they got pay for them or not. The first party that he ever knew to make mills with the bar, shaft, and cleaner was John Bean. Burrows, the former partner of Bean at the time of the making and selling of the machines in question, examined as a witness on the part of the appellees, if the objection to his competency

should be considered as waived, says nothing materially contradictory of the testimony of Davis and Thayer. He says: "In company with John Bean, I got up some mills for public use in the spring of 1858, containing the vibratory bar and rock shaft. I do not know but some were made in the latter part of 1857, but with regard to this I cannot speak definitely." Q. "Why not? Did the partners keep no memorandum of the sales?" A. "The mills that we first sold with the vibratory bar and rock shaft were sold on experiment. They were put on trial. The parties had the right to return them or keep them as they saw fit."

Assuming, as the commissioner decides, that the inventions of the patentees and the claimants are substantially alike, and that in point of time the claimants' is prior, the question is, whether the right of the claimants has not been lost by statutory bar or abandonment, and, first, upon the ground of sale, or of keeping the machine, after having been completed, on sale, and that may depend on the point of time when made, and the nature of the transaction which the commissioner calls the conditional sale for experiment.

As to the point of time, it is contended by the appellants that it was in the fall of the year 1857. On the other hand, it is denied. The commissioner admits that there is a possibility that the proof does amount to that, but that it was sold on an experiment; that the purchaser had the right to keep it or return it, if he pleased; and that two seasons of trial was not an unreasonable length of time for that purpose.

The two first witnesses, who were workmen of the trade, and lived and worked in the shop of Bean & Burrows in the year 1857, prove that some machines of the kind were completed and on sale in the fall of 1857, which had been built by Bean, as one of them states, in the summer or fall of 1857; that during that period he understood they were built for public use, and made and sold for public use; that Bean & Burrows sent off such mills, but he does not know whether they paid for them or not. Now, if this testimony stood alone, it would be difficult to conceive how any person could doubt for a moment that their testimony amounted to full proof. Then, what is there to impair the weight of their testimony? Burrows, who was a former partner, called as a witness on the part of the appellants, and therefore feeling his leanings in favor of appellants, from the relation in which he stood,—but what does he say? That Bean and himself got up some of them in the spring of 1858 for public use, and he does not know but that some of them were made in the latter part of 1857. Does this deny that John Bean had made some in the summer of 1857, which they had on sale in their shop, and sent off in the fall of 1857?

The two witnesses, who stand fair as to credit, speak of the fact positively. The other, only doubtingly. I am satisfied, therefore, that it happened in 1857, as they state.

Now as to the condition. The two witnesses first alluded to say nothing about any such condition. The witness Burrows says they were sold on experiment. They were put on trial. The parties had the right to return them or keep them as they saw fit. This experiment, then, was after the machine had been completed and put on sale for public use in the shop, on account of the purchaser himself, and not as a neighborly act on account of the inventors, without profit, without limit of time or restraint as to a public or private use, but on the contrary put out of the possession and control of the appellants as to both. This was all done more than two years before the application for a patent. Under such circumstances, I am clearly of opinion, and I do hereby so decide, that the said claim of the said Bean and Wright is barred and precluded by the statute, and without protection, and that they are not entitled to a patent, as awarded by the commissioner; that the said decision is erroneous, and the same is hereby reversed and annulled.